## WHITWELL v. WRIGHT et al.

(Supreme Court, Special Term, Ontario County. February 3, 1909.)

1. BANKRUPTCY (§ 159*)—PREFERENCES—CONVEYANCE OF LAND.

    A trustee in bankruptcy can recover land on showing that bankrupt was insolvent when he deeded it to defendant; that the transfer enabled defendant, as a creditor, to obtain a greater percentage of his debt than other creditors of the same class; that defendant had reasonable cause to

believe that the conveyance was intended to give him a preference; and that the petition in bankruptcy was filed within four months after the deed was recorded.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 159.*]

2. BANKRUPTCY (§ 100*)—ADJUDICATION—CONCLUSIVENESS.

In an action by a trustee in bankruptcy to avoid a deed by the bankrupt as an unlawful preference under the bankruptcy act, an adjudication of bankruptcy on the express ground that, when the deed was made within four months preceding the filing of the petition, bankrupt was insolvent, is conclusive against defendant grantee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 100.*]

3. BANKRUPTCY (§ 166*) — PREFERENCES — BANKRUPT'S INTENT — NOTICE TO CREDITOR.

A creditor has reasonable cause to believe that a deed to him by insolvent was intended as a preference over other creditors if he had knowledge or notice of facts sufficient to put a reasonably cautious, prudent person upon inquiry.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 256, 257; Dec. Dig. § 166.*]

4. BANKRUPTCY (§ 4*)—BANKRUPTCY LAW—PURPOSE.

The intent of the bankruptcy law is to equally distribute the assets of insolvents among their creditors and to prevent preferences and favoritism.

[Ed. Note.—For other cases, see Bankruptcy, Dec Dig. § 4.*]

5. BANKRUPTCY (§ 303*)—PREFERENCES—CREDITOR'S KNOWLEDGE—EVIDENCE—SUFFICIENCY.

Evidence *held* to show that a creditor had reasonable cause to believe that a deed to him by insolvent was intended as a preference within the bankruptcy law.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.*]

6. BANKRUPTCY (§ 303*)—PREFERENCES—SUIT TO AVOID—EVIDENCE.

In an action by a trustee in bankruptcy to avoid an unlawful preference, defendant creditor could introduce other parts of the record in the bankruptcy proceedings to show that the petition on which the adjudication was based was not the one received in evidence in such action, but, in the absence of such evidence, the court must assume that the petition acted upon by the bankruptcy court is the one produced; the trustee not being required to produce the whole record to have the benefit of the adjudication proved.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.*]

Action by Francis W. Whitwell, trustee in bankruptcy of Charles C. Gates, against Frank M. Wright and others, to set aside as an unlawful preference under the bankruptcy act a deed made by the defendant Charles C. Gates and wife to the defendant Frank N. Wright of a farm of about 126 acres, situate in the town of Seneca, Ontario county, made on the 9th day of October, 1906. Judgment for plaintiff.

Lansing G. Hoskins, for plaintiff.
George L. Bachman, for defendants.

FOOTE, J. The plaintiff is entitled to recover in this action if he has established that at the time the deed was made on the 9th day of October, 1906, Charles C. Gates, the grantor, was insolvent; that the effect of the transfer was to enable his creditor, Frank E. Wright, the grantee, to obtain a greater precentage of his debt than

his other creditors of the same class; that Wright had reasonable cause to believe that it was intended thereby to give him a preference; and that the petition in bankruptcy upon which Gates was subsequently adjudged a bankrupt was filed within four months after said deed was recorded on the 12th day of October, 1906.

It is established by the testimony that the effect of the conveyance of this farm to Wright is to give Wright a greater percentage of his debt than any of Gates' other creditors will receive. Indeed, it paid in full his debt of about $8,000. That the petition in bankruptcy was filed within four months after the recording of the deed is shown by the certified copy of the petition introduced in evidence, which was filed on the 2d day of February, 1907, in the bankruptcy court. That Gates was insolvent at the time the deed was made the plaintiff contends is conclusively established by the adjudication in bankruptcy, and no other evidence was offered upon that subject, and, when the defendant offered testimony tending to show that Gates was not insolvent at the time this deed was made, it was excluded by the court on plaintiff's objection upon the concession then made by plaintiff's counsel that, unless the adjudication in bankruptcy was conclusive upon the question of Gates' insolvency at the time the deed was made, then plaintiff's case had not been proved or established as regards that question.

Upon the question as to whether Wright at the time he received this deed had reasonable cause to believe that it was intended to give him preference, the plaintiff relies chiefly upon the testimony of Gates as a witness, and the deposition of Wright, whose testimony was taken by commission, as well as upon the other facts and circumstances appearing in the record as to the financial condition of Gates and his confidential relation to Wright.

There are, therefore, but two questions to be considered which are debatable: First. Does the adjudication in bankruptcy establish conclusively as against the defendant Wright that Gates was insolvent at the time this deed was made? Second. Did Wright have reasonable cause to believe that it was intended to give him preference as a creditor?

The petition in bankruptcy alleges that Gates "is insolvent, and that within four months preceding the filing of this petition, to wit, on the 9th day of October, 1906, the said Charles C. Gates, while insolvent, committed an act of bankruptcy in that he did on said 9th day of October, 1906, transfer a portion of his property, to wit, certain real estate consisting of a farm situate in the town of Seneca, county of Ontario, and state of New York, to one of his creditors, to wit, Frank N. Wright, with intent to prefer such creditor Frank N. Wright over his other creditors." No other act of bankruptcy is alleged in the petition. The adjudication, which was not made until the 21st of March, 1908, after the formal part which recites the filing of the petition, is as follows:

"And the said alleged bankrupt having appeared herein and filed an answer to said petition, and the issues so made having been referred to Mark T. Powell, Esq., as special master, to ascertain and report the facts with his conclusions thereon, and the said special master having filed his report find-

ing that the said Charles C. Gates should be adjudged a bankrupt, and the exceptions filed to said report of the special master having been over-ruled, and the said report of said special master having been in all things duly confirmed by the court, the said Charles C. Gates is hereby declared and adjudged bankrupt accordingly."

The petition on which this adjudication was founded must be re-ferred to to ascertain what is actually adjudicated, and we find the actual adjudication to be that Gates on the 9th day of October, 1906, being then insolvent, did commit an act of bankruptcy by making the deed in question to his creditor Frank N. Wright, with intent to prefer him over his other creditors. These facts are then conclusively established by this adjudication as against Gates. Are they also con-clusively established as against the creditor Wright?

I find in the books a great variety of opinion upon this question. In some of the cases it is held that the adjudication is in rem and con-clusive as to everybody as regards the essential facts necessary to be established to authorize the adjudication, and particularly as to all creditors of the bankrupt who are permitted by the bankruptcy law, if they choose, to appear and be heard in opposition to the adjudica-tion. In other cases it is said that the rem involved is only the status of the individual proceeded against as a bankrupt, and not conclusive, except as between the immediate parties to the proceeding and such creditors as do appear upon the particular facts alleged.

Mr. Remington in his recent work on Bankruptcy has collected and reviewed with care and discrimination the decided cases, and as a re-sult has incorporated these statements in the text of his treatise:

"The adjudication is binding upon all the world in subsequent litigations between the same adverse parties or their privies as to the status of the debtor as a bankrupt, and perhaps also as to the commission of the act of bankruptcy adjudicated and all essential facts involved in the determination of those two issues. * * *" 1 Remington on Bankruptcy, p. 283, § 444.

This he qualifies in the next section as follows:

"Perhaps, indeed, the true rule is that the adjudication in bankruptcy, though to be sure it is in a proceeding in rem 'binding on the whole world,' is not binding on others than those actually engaged in the litigation except as to the status of the debtor as a bankrupt; that the constructive presence of all creditors does not obtain except as to the subject of the debtor's status; that, therefore, except as to parties who have actually litigated the issues, the adjudication in bankruptcy is not binding in subsequent litigation on the matters of insolvency, nor even on the matter of the commission of the very act of bankruptcy on which the adjudication is based. * * *"

This learned author has collected under these sections a large number of decisions, mainly from the federal courts, which show the opposing views of different judges who have had the question under consideration, and so far as the federal reports are concerned I think the question is not authoritatively settled.

The question, however, has been passed upon recently by the Ap-pellate Division of this court in this department in the case of De Graff v. Lang, 92 App. Div. 564, 87 N. Y. Supp. 78. In that case a judgment creditor, whose judgment was recovered within four months of the filing of the petition in bankruptcy, proceeded by ex-ecution to sell certain property of the bankrupt, and the trustee later

appointed brought action against the judgment creditor to recover the amount so collected by that creditor and applied upon her judgment, and to prove that the bankrupt was insolvent at the time the judgment was recovered the plaintiff relied wholly upon the adjudication in bankruptcy which so adjudged. The court below held that that adjudication was not evidence of such insolvency as against the judgment creditor, and that such insolvency must be established by common-law proof. In reversing this decision it is said in the opinion of Presiding Justice McLennan:

"We think it should be held that the decree of the United States District Court put in evidence conclusively establishes for the purposes of this action that Fanny Meng was insolvent at the time the defendant recovered judgment against her and sold her property by virtue of the execution issued upon such judgment. Any other holding would lead to endless confusion in the administration of the law, and would in many cases nullify one of the principal purposes of the bankruptcy act."

This authority must be deemed controlling, and I feel bound to follow it in this case. Accordingly the insolvency of Gates at the time he made the deed in question must be held to be conclusively established against the defendants in this action by the adjudication in bankruptcy.

Did the defendant Wright have reasonable cause to believe that the conveyance of the farm to him was intended to give him a preference over other creditors? Under the authorities he did have such cause to believe, if he had knowledge or notice of facts sufficient to put a reasonably cautious and prudent person upon inquiry. The intent of the bankruptcy law is to make an equal distribution of the assets of insolvent persons among their creditors and to prevent preferences and favoritism. At the time of this transaction Gates was insolvent, and Wright's claim against him unsecured and uncollectible by any legal proceedings. The motives which should lead Gates to prefer Wright were strong, and both have strong motives of personal interest to sustain this transfer. In view of these conditions, the testimony of both Gates and Wright must be scrutinized, and must not be allowed to prevail as against undisputable facts and circumstances. The farm in question was of the value of about $10,000. Gates' indebtedness to Wright was $7,000, with about $1,500 of accrued interest; no interest having been paid for four or five years. This debt represented borrowed money. It began some 20 years before with a loan of $1,000 from Wright to Gates, and from time to time others loans were made the last being for $2,000, which was about four years before this transaction. Gates was a brother-in-law of Wright; Wright having married Gates' sister. Wright formerly resided in and near Geneva where Gates lived, but a few years before this transaction had changed his place of residence to St. Paul, Minn. He came down from St. Paul to Geneva on the 25th of September, 1906, and stayed there and in that vicinity for about three weeks, during which time this transaction was consummated. He stayed about a third of the time at the house of Mr. Gates as a guest. He brought with him from St. Paul in money or currency the $1,900 or $2,000 which he paid as the purchase price of this farm, in excess of the

amount of Gates' debt to him. He also brought with him from St. Paul Gates' note for $7,000. Gates was the treasurer and principal financial manager and a stockholder of the Torrey Park Preserving Company, which carried on a canning and preserving business at Geneva, and in which Wright was also a stockholder to the amount of $1,100 from the beginning of its business. This company was in financial difficulties and went into the hands of a receiver in less than four months after the transaction in question here, and was subsequently adjudged a bankrupt. Gates' principal asset, outside of this farm, was in this Torrey Park Preserving Company, which, in addition to his stock, owed him over $14,000 for back salary and borrowed money, and he was an indorser upon a large amount of its paper held in the banks at Geneva. Wright visited the office of the Torrey Park Preserving Company while he was at Geneva, and talked with its officers and employés, but says he did not inquire as to its financial condition, and did not know its financial condition. He did not visit the farm which he bought while he was there, except to drive along the road in going to another place. The negotiation for the purchase of the farm was, according to his testimony and Gates', of the briefest character, and it was agreed to on the second day after it was first mentioned. Wright accepted the first price suggested by Gates as the value of the farm, $10,000, and, until the transaction came to be closed, there was not a word said as to whether the notes which Wright held were to be paid or not in the transaction. No inquiry or examination was made as to Gates' title to the farm, except that Wright asked him if there were any liens upon it and he said there were not. When the deed was delivered, the notes which Wright had held were destroyed. The deed was taken to Canandaigua, the county seat, and recorded on the 12th day of October, but none of the tenants living on the farm and none of Gates' or Wright's friends or acquaintances in Geneva were informed of the transaction until Gates told it to an officer of one of the banks in Geneva about three months afterward. The tenant on the farm sent the check for the rent due in December to Gates, and Gates indorsed it, and forwarded it to Wright at St. Paul. The fire insurance on the buildings, about $6,000, was not changed, and Wright made no provision for insurance on the buildings until about the time in January when Gates informed the banker of the transfer. The reason given by Gates to Wright for wishing to sell the farm was that he had some debts that he wished to pay, or, as Wright states it, that he had some money he wished to pay. But Gates realized only about $1,900 in money from this sale; hence Wright must have realized that Gates' financial condition was such that he felt obliged to resort to this valuable farm, which was free of incumbrance, to raise $1,900.

Wright did not attend the trial, but had his testimony taken at St. Paul by commission, and I have not had the benefit of his appearance as a witness on the stand.

On these facts I am impressed with the conviction that Wright prepared himself to make this or some similar transaction with Gates before he left St. Paul by providing himself with the currency and Gates' notes which would be needed, and that his carrying with him

that amount of currency is a transaction so unusual at the present day as to suggest an intent to conceal the fact of such a transaction having taken place from the banks at Geneva, which might have been discovered had a check or draft been used; also, that there was an intentional concealment of the transaction after it was made for over three months by both Wright and Gates, and to that end the buildings on this farm were allowed to go unprotected by insurance against fire during that time, though Gates had carried $6,000 of such insurance.

The recording of the deed at Canandaigua would ordinarily indicate a contrary intent, but in this case it does not seem to have given notice of the transaction to any interested party, and I think the parties may well have assumed that the fact would not be likely to become known in Geneva. But we must remember that it was necessary to record the deed. That was a risk that must be taken for bankruptcy would invalidate such a deed not recorded more than four months before filing the petition.

Giving due weight to all these facts and circumstances, it must be held that Wright knew of Gates' financial condition or purposely avoided informing himself, and that in either case he had notice of facts and circumstances sufficient to have put him upon his inquiry as to Gates' solvency.

It is suggested in the brief of defendants' counsel that some of the petitioners did not have provable claims, and that other creditors were allowed to join to supply this defect, but at a date after four months had expired, and that thus no valid petition was filed within four months and that this would appear if the whole of the record in the bankruptcy court were produced. Undoubtedly it was the privilege of defendants' counsel to introduce other parts of that record, if he wished, to show that the petition on which the adjudication is based is not the one produced and received in evidence, but, in the absence of all such evidence, I must assume that the petition acted upon by the court is the one produced here from its records, and I am referred to no authority and am aware of none which requires the plaintiff to produce the whole record before he can have the benefit of the adjudication here proved.

These views lead to the conclusion that the plaintiff must prevail in this case. Costs are awarded to plaintiff, findings to be settled upon two days' notice.